IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| CORY JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| THE CITY OF URBANA, ILLINOIS, | ) | |
| a municipal corporation, THE CITY OF | ) | |
| CHAMPAIGN, ILLINOIS, a municipal | ) | |
| corporation, JEFFREY STEINBERG, | ) | |
| DUANE SMITH, MATTHEW BAIN, | ) | |
| ELIZABETH ALFONSO, DAVE ROESCH, | ) | |
| MICHAEL CERVANTES, JAMES KERNER, | ) | JURY TRIAL DEMANDED |
| MATTHEW QUINLEY, JAY LOSCHEN, | ) | |
| DAVE GRIFFET, and UNKNOWN | ) | |
| EMPLOYEES OF THE CITY OF URBANA, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AT LAW

NOW COMES, Cory Jackson ("Mr. Jackson" or "Plaintiff"), by and through his attorneys, NATHAN & KAMIONSKI LLP, and complaining of the Defendants Jeffrey Steinberg, Duane Smith, Matthew Bain, Elizabeth Alfonso, Dave Roesch, Michael Cervantes, James Kerner, Matthew Quinley, Jay Loschen, Dave Griffet, the City of Champaign, Illinois, the City of Urbana, Illinois, and Unknown Employees of the City of Urbana, and states as follows:

### Introduction

1.  Plaintiff Cory Jackson was wrongfully charged and prosecuted for the murder of Martez Taylor and for discharging a firearm, crimes which he did not commit.

2.  These charges were the direct result of serious misconduct by officers of the Urbana Police Department tasked with investigating Mr. Taylor's murder.

3. Defendant Officers knew within hours of the shooting that Keith Campbell was the shooter. Yet, Defendant Officers disregarded this information and proceeded to obtain knowingly false witness statements implicating Cory Jackson.

4. Defendant Officers also fabricated police reports and withheld evidence that would have demonstrated Plaintiff's innocence.

5. No physical or forensic evidence ever inculpated Mr. Jackson. Mr. Jackson never confessed to this crime and maintained his innocence throughout his prosecution.

6. Due to these baseless charges, Mr. Jackson spent 14 months in custody awaiting trial until he was ultimately acquitted and cleared of these charges on October 11, 2019. This lawsuit seeks redress for his injuries.

## Jurisdiction and Venue

7. This Court has federal question jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising out of state law.

8. Venue is proper in the Central District of Illinois under 28 U.S.C. § 1391(b). On information and belief, all defendants reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within this district.

## Parties

9. Cory Jackson is a 32-year-old United States citizen who, at all times relevant hereto, resided in the Central District of Illinois.

10. Defendant City of Urbana is a municipal entity organized under the laws of Illinois.

11. Defendant City of Champaign is a municipal entity organized under the laws of Illinois.

12. At all times relevant hereto, Defendants Jeffrey Steinberg, Duane Smith, Matthew Bain, Elizabeth Alfonso, Michael Cervantes, Dave Roesch, Matthew Quinley, Jay Loschen, and James Kerner were Urbana Police Officers acting under color of law within their authority as duly appointed officers by the Urbana Police Department.

13. At all times relevant hereto, Defendant Dave Griffet was a Champaign Police Officer acting under color of law within his authority as a duly appointed officer by the Champaign Police Department.

14. At all times relevant hereto, Unknown Employees of the City of Urbana acted under color of law within their authority as duly appointed officers by the Urbana Police Department.

15. Jeffrey Steinberg, Duane Smith, Matthew Bain, Elizabeth Alfonso, Michael Cervantes, Dave Roesch, Matthew Quinley, David Giffet, James Kerner, Jay Loschen, and Unknown Employees of the City of Urbana are referred to herein collectively as "Defendant Officers." At all times relevant hereto, Defendant Officers were acting in their individual capacities and under color of law and within the scope of their employment.

### The Murder of Martez Taylor

16. At approximately 12:42 am on July 21, 2018, Martez Taylor was shot and killed in the driveway of a townhome in the 1900 block of East Florida Avenue in Urbana, Illinois.

17. Just prior to the shooting, Mr. Taylor got into a physical fight with Keith Campbell during a party at the townhome, after he accidentally bumped into Campbell, who was heavily intoxicated at the time. During this entire exchange, Cory Jackson was on the back patio with other attendees of the party.

18. After Taylor and Campbell exchanged blows, Campbell exited out the back door of the townhome while Taylor exited out the front door.

19. Taylor walked over to his cousin Malaia Turner's Mitsubishi Gallant that was parked in the driveway. Turner got into the rear driver seat of the car and shut the door.

20. Not long after Taylor got in the back seat of the car, shots were fired into the rear driver side window of the Mitsubishi, striking Taylor three times. The shooter fled immediately after the last shot fired.

21. Mr. Jackson had no involvement in Taylor's murder. Mr. Jackson was walking outside to his car as the shots were fired.

22. Minutes after the shooting, METCAD dispatched to officers that a man had been shot at 1905 East Florida Avenue, and Urbana Police Officers Paige Bennett, Sarah Links, Bryan Fink, John Franquemont, Sergeant Jennifer Difanis and other unknown officers responded to the crime scene.

23. While officers were arriving at the scene, Taylor was being transported to Carle Hospital in a white Chrysler 300 driven by Vincent Mosley.

24. The white Mitsubishi Gallant in which Taylor was shot was towed to 704 Glover Street to be processed for evidence.

25. Several Urbana police officers responded to Carle Hospital, including Officers Jared Hurley and Walker, Defendant Sergeant Jay Loschen, and Defendant Detectives Matthew Bain and Matthew Quinley. Present at the hospital were also unknown University of Illinois police officers.

26. Mosley parked his car in front of the ambulance bay at Carle Hospital. Officer Hurley helped get Taylor out of the car and into the hospital. Taylor died shortly thereafter.

27. Defendant Loschen told Defendant Bain that he would like to photograph and process the Chrysler 300, and then return it to Mosley. Defendant Bain permitted this action.

28.  Defendant Loschen photographed and inspected Mosley's Chrysler 300. After his search, Defendant Loschen immediately released the vehicle to Mosley and Mosley left the area. Defendant Loschen released this vehicle before it was ever tested for forensic evidence or examined by Mr. Jackson or his attorney.

### Defendants Knowingly Obtain an Unreliable Account from Malaia Turner

29.  On the night of the shooting, while at Carle Hospital, Defendants Bain, Quinley, and Steinberg spoke with Malaia Turner, Taylor's cousin. Ms. Turner told Defendant Bain and other Defendant Officers that she did not actually have the opportunity to see the shooter but that she believed it was Jackson.

30.  Based on Turner's statements indicating her lack of actual personal knowledge and their knowledge that her account was inconsistent with the physical evidence, Defendant Officers knew that Ms. Turner's speculation regarding Jackson being the shooter was unreliable and did not create probable cause.

31.  In fact, even today, the state's current position is that Campbell was the true killer and he is a wanted fugitive.

32.  Nevertheless, Defendant Officers had Ms. Turner provide them with a Facebook photograph of Jackson. Defendants Bain and Officer Joseph Cassidy issued a stop order to neighboring police agencies, directing that Mr. Jackson be located and arrested.

33.  Prior to the investigation of Taylor's murder, Cory Jackson was known to both Defendants Loschen and Quinley.

34.  On information and belief, Defendant Officers met with Malaia Turner multiple times in the lead-up to the trial, continuing to pressure her to find more witnesses to recite the same

5

story she gave implicating Mr. Jackson. Upon information and belief, on each occasion, Defendant Officers fed Malaia Turner information in an effort to build up her credibility.

### Defendants Bury the Identity of "Witness A"

35. During the early morning hours on the night the shooting occurred, July 21, 2018, Defendant Officers received information from a witness to Taylors's murder that Campbell was the shooter and Mr. Jackson was not involved. Defendant Officers have concealed the identity of this witness; therefore, he or she will be referred to herein as "Witness A".

36. Specifically, Champaign Police Detective David Griffet received a phone call on July 21, 2018, from Witness A that Keith Campbell shot Taylor at a party in Urbana.

37. Defendant Griffet then shared this information with Defendant Officers. However, since Witness A's account did not match Defendant Officers' false hypothesis that Mr. Jackson was the shooter, they disregarded the account of Witness A and buried his or her identity even though it exculpated Mr. Jackson.

38. In addition, Defendant Griffet then fabricated a police report claiming that he did not know the identity of Witness A. Even after Mr. Jackson's criminal defense attorney obtained a court order compelling Defendant Griffett to disclose the identity of Witness A, Defendant Griffett still failed to disclose this critical and exculpatory information.

39. Rather than properly investigate the shooting and pursue Kevin Campbell as the only legitimate suspect, Defendant Officers made a deliberate plan to suppress Witness A's identity and proceed with knowingly false statements from witnesses implicating Mr. Jackson in the murder.

### Defendants Fabricate Statements from Yasmine Nichols and Shakeyla McCoy

6

40. In the days that followed, Defendant Steinberg, Bain, Quinley, Cervantes, Alfonso, and Smith interviewed a number of witnesses, including Wendy Driver, Wardell Lawrence, Vincent Mosley, and Dejermaine Pettis, none of whom could identify the shooter.

41. Upon information and belief, one or more of these witnesses, including Wendy Driver, told Defendant Officers that Malaia Turner and her sister were not in a position to actually see the shooting of Turner.

42. During the investigation, Defendants Steinberg, Bain, Quinley and other Defendant Officers procured through improper means the knowingly false statements from Malaia Turner, Yasmine Nichols, Shakeyla McCoy, and Alisha Turner.

## The Coerced Statement of Yasmine Nichols

43. On July 24, 2018, at approximately 12:00 p.m., Defendants Alfonso and Smith interviewed Yasmine Nichols at the Urbana Police Department, provided her with a single photo of Mr. Jackson, and coerced Ms. Nichols into providing a knowingly false account that now claimed Mr. Jackson was not the shooter, but that he was an accomplice who handed the shooter the gun.

44. Shortly thereafter, on September 17, 2019, Yasmine Nichols recanted the false statement that was coerced by Defendant Officers. Ms. Nichols said that she did not see Mr. Jackson with the gun that night, nor did she see Jackson pass a gun to anyone.

45. On or about September 19, 2019, Allen Williams and Yasmine Nichols recorded Facebook live videos indicating that witnesses were paid, threatened, or coerced into providing a statement implicating Jackson as the shooter. Defendant Officers were aware of these Facebook videos, yet continued to try and rely upon the false account of Nichols which they had procured in order to continue the criminal proceedings against Mr. Jackson.

7

### The Coerced Statement of Shakeyla McCoy

46. Much like the false statement Defendant Officers procured from Ms. Nichols, Defendant Officers also procured a similar false statement of involvement from her sister, Shakeyla McCoy.

47. On July 24 and 25 of 2018, Ms. McCoy told Defendants Bain and Steinberg that she was not in a position to be able to make any identifications with respect to the shooting of Taylor. Nevertheless, Defendants Bain and Steinberg fabricated a statement from Ms. McCoy that she witnessed Campbell shoot Taylor after Mr. Jackson handed him the gun.

48. On September 20, 2019, McCoy recanted the false statement Defendants Bain and Steinberg procured and admitted that did not actually see Jackson hand anyone a gun that evening.

### The Fabrication of Malaia Turner's "Revised" Account

49. On September 16, 2019, Malaia Turner recanted her previous statement to the police and told Defendant Officers that, contrary to her speculation on the night of the shooting, she in fact did not see Mr. Jackson shoot the gun. However, Malaia Turner told Defendant Officers that she "did not want to hurt the chances of a conviction."

50. Upon information and belief, Defendant Officers then fed Malaia Turner information about the statements made by other witnesses in their investigation, thereby encouraging her to provide another false account: this time, a false account that Mr. Jackson handed the gun to the shooter rather than actually fired the gun himself.

51. Upon information and belief, Malaia Turner changed her statements about the nature of Mr. Jackson's supposed involvement in Turner's death no less than four times before Mr. Jackson's criminal trial.

52.     The false statements provided by Turner, Nichols, and McCoy were the lynchpin of the state's case against Mr. Jackson.

### Deliberate Suppression of Crime Scene Evidence

53.     In addition to withholding the identity of Witness A, Defendant Officers also failed to turn over other evidence that exculpated Mr. Jackson.

54.     For example, Defendant Steinberg released the vehicle in which the murder took place to his "star witness", Malaia Turner, before ever providing Jackson's criminal defense attorney the opportunity to inspect the vehicle.

55.     In addition, Defendants Steinberg and Bain never downloaded the data contained on three cell phones found inside the vehicle in which Turner was murdered.

56.     Instead, after taking a cursory glance at each phone, Defendants Steinberg and Bain returned the cell phones to Malaia Turner and Taylor's friend, Dejermaine Pettis. Once more, Mr. Jackson's defense attorney had no opportunity to review the contents of these cell phones.

57.     Upon information and belief, Defendant Officers also never sent the shell casings recovered at the scene to the lab for forensic testing.

### Mr. Jackson's Trial

58.     From the moment he was arrested, Mr. Jackson maintained his innocence. On October 8, 2019, Plaintiff stood trial by a jury.

59.     Ms. Nichols took the stand and claimed that she did not see Mr. Jackson with a gun that night, contradicting the statements Defendant Officers had fabricated.

60.     Similarly, Ms. McCoy took the stand and testified that her previous statement to Defendant Officers was fabricated, and that she did not see Jackson hand a gun to Campbell.

61. Because the three cell phones found in the murder vehicle as well as the murder vehicle itself were released mere days after the shooting, Mr. Jackson could not present exonerating evidence believed to be contained on the phones and in the murder vehicle.

62. On October 11, 2019, Plaintiff was acquitted of all charges in connection with the shooting. Though completely innocent of the crimes charged, Mr. Jackson spent 14 months awaiting trial.

63. Faced with the knowledge that serious prison time would result if he were convicted of first degree murder, Mr. Jackson experienced daily hardship and stress, and additional damages associated with having to live under harsh conditions at the Champaign County Jail.

64. During this time, Plaintiff not only lost his liberty and connection with family and friends, but also his ability to earn a respectable living and participate in the dignity and liberty that is foundational to meaningful human existence.

65. Upon information and believe, Campbell is still wanted by the Urbana Police Department for the shooting of Taylor and has yet to be arrested.

**COUNT I – 42 U.S.C. § 1983**
**Deprivation of Liberty without Probable Cause**
**(Against Defendant Officers)**

66. Plaintiff hereby incorporates each of the preceding paragraphs of this Complaint as if fully restated herein.

67. As described more fully above, Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

68. In the manner described more fully above, Defendant Officers, individually, jointly, and in conspiracy with one another, and other still unknown co-conspirators, relied upon witness statements they knew to be false, fabricated reports, and withheld exculpatory evidence to cause the institution and continuation of criminal proceedings against Plaintiff without probable cause.

69. Defendant Officers initiated and continued judicial proceedings against Plaintiff maliciously, resulting in Plaintiff's detention for approximately fourteen months without probable cause. Absent Defendant Officers' misconduct, the prosecution of Plaintiff could not and would not have been pursued.

70. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with willful indifference to Plaintiff's clearly established constitutional rights.

71. As a direct and proximate result of Defendant Officers' conduct, Plaintiff suffered injuries, including but not limited to the loss of liberty and emotional pain and suffering.

### COUNT II – 42 U.S.C. § 1983
### Failure to Intervene
### (Against Defendant Officers)

72. Plaintiff hereby incorporates each of the preceding paragraphs of this Complaint as if fully restated herein.

73. As described more fully above, Defendant Officers, while acting under color of law and within the scope of their employment, during the constitutional violations described herein, stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

74. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and with willful indifference to Plaintiff's clearly established constitutional rights.

75. As a direct and proximate result of Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty and emotional pain and suffering.

## COUNT III – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights
## (Against Defendant Officers)

76. Plaintiff hereby incorporates each of the preceding paragraphs of this Complaint as if fully restated herein.

77. As described more fully above, Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit, thereby depriving him of his constitutional rights.

78. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed amongst themselves to protect one another from liability for depriving Plaintiff of these rights.

79. In furtherance of their conspiracy, each of these co-conspirators committed overt acts as described more fully above and were otherwise willful participants in joint activity.

80. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and with willful indifference to Plaintiff's clearly established rights.

81. As a direct and proximate result of Defendant Officers' misconduct, Plaintiff suffered injuries, including but not limited to loss of liberty and emotional pain and suffering.

## COUNT IV – State Law Claim
## Malicious Prosecution

**(Against Defendant Officers)**

82. Plaintiff hereby incorporates each of the preceding paragraphs of this Complaint as if fully restated herein.

83. Defendant Officers charged Plaintiff knowing those charges lacked probable cause. Defendant Officers made statements to prosecutors with the intent of instituting and continuing judicial proceedings.

84. Defendant Officers cause Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

85. Defendant Officers procured false statements, fabricated evidence, and withheld exculpatory evidence in bad faith. Defendant Officers were aware that no true or reliable evidence implicated Plaintiff in the murder of Martez Taylor.

86. Defendant Officers also failed to investigate evidence that would have implicated the actual perpetrator.

87. The criminal proceedings against Plaintiff were terminated in his favor.

88. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and with malice and reckless indifference to the rights of others.

89. As a direct and proximate result of Defendant Officers' misconduct, Plaintiff suffered injuries, including but not limited to emotional pain and suffering.

### COUNT V – State Law Claim
### Intentional Infliction of Emotional Distress
### (Against Defendant Officers)

90. Plaintiff hereby incorporates each of the preceding paragraphs of this Complaint as if fully restated herein.

91. As described more fully above, the acts and conduct of Defendant Officers were extreme and outrageous.

92. Defendant Officers' actions were rooted in an abuse of power or authority, and were undertaken with the intent to cause, or were in reckless disregard of, the probability that their conduct would cause severe emotional distress to Plaintiff.

93. As a direct and proximate result of Defendant Officers' actions, Plaintiff suffered and continues to suffer emotional distress.

## COUNT VI – State Law Claim
## Civil Conspiracy
## (Against Defendant Officers)

94. Plaintiff hereby incorporates each of the preceding paragraphs of this Complaint as if fully restated herein.

95. As described more fully above, Defendant Officers, acting in concert with each other and with other individuals, known and unknown, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

96. In furtherance of the conspiracy, one or more of the co-conspirators engaged in and facilitated one or more overt acts and were otherwise willful participants in joint activity, including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotion distress upon Plaintiff.

97. The misconduct described in this Count was undertaken intentionally, with malice and reckless indifference to the rights of others.

98. As a direct and proximate result of Defendant Officers' conspiracy. Plaintiff suffered damages, including emotional pain and suffering.

## COUNT VII – State Law
## *Respondeat Superior* Claim

**(Against City of Urbana & City of Champaign)**

99.     Plaintiff hereby incorporates each of the preceding paragraphs of this Complaint as if fully restated herein.

100.    Defendant Officers Jeffrey Steinberg, Duane Smith, Matthew Bain, Elizabeth Alfonso, Dave Roesch, Michael Cervantes, James Kerner, Matthew Quinley, and Jay Loschen were, at certain times material to this complaint, employees of Defendant City of Urbana, and were acting within the scope of their employment.

101.    Defendant Officers' acts which violated state law are directly chargeable to Defendant City of Urbana under state law pursuant to *respondeat superior*.

102.    Defendant Officer Dave Griffet was, at certain times material to this complaint, an employee of Defendant City of Champaign, and was acting within the scope of his employment.

103.    Defendant Griffet's acts which violated state law are directly chargeable to Defendant City of Champaign under state law pursuant to *respondeat superior*.

### COUNT VIII – State Law
### Statutory Indemnification Claim
**(Against City of Urbana & City of Champaign)**

104.    Plaintiff hereby incorporates each of the preceding paragraphs of this Complaint as if fully restated herein.

105.    Defendant Officers Jeffrey Steinberg, Duane Smith, Matthew Bain, Elizabeth Alfonso, Dave Roesch, Michael Cervantes, James Kerner, Matthew Quinley, and Jay Loschen were, at certain times material to this complaint, employees of Defendant City of Urbana and were acting within the scope of their employment.

106.    Under 745 ILCS 10/9-102, the City of Urbana must pay any tort judgment for compensatory damages that is adjudicated against Defendant Officers.

107. Defendant Officer Dave Griffet was, at certain times material to this complaint, an employee of Defendant City of Champaign and was acting within the scope of his employment.

108. Under 745 ILCS 10/9-102 the City of Champaign may pay any tort judgment for compensatory damages that is adjudicated against Defendant Griffet.

WHEREFORE, Plaintiff respectfully demands that judgment be entered in his favor and against Defendant Officers, the City of Urbana, Illinois, and the City of Champaign, Illinois with respect to all counts set forth in this complaint, that he be granted reasonable compensatory damages in an amount to be determined at trial, that punitive damages be awarded and assessed against Defendant Officers, and that costs and attorneys' fees be assessed against the defendants.

## JURY DEMAND

Plaintiff, Cory Jackson, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues to triable.

Respectfully submitted,

*/s/ Shneur Z. Nathan, Att. No. 6294495*
Shneur Z. Nathan
Avi Kamionski
Natalie Adeeyo
Nathan & Kamionski LLP
33 W. Monroe, Suite 1830
Chicago, Illinois 60603
(312) 612-1955
snathan@nklawllp.com